UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

---

In re:  Case No. 18-10327-12

Mark Eugene Johnson,

    Debtor.

---

**HIAWATHA NATIONAL BANK'S POST-TRIAL MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

---

Creditor Hiawatha National Bank ("Hiawatha"), by its attorneys, Eckberg Lammers, P.C., hereby moves the Court for an Order dismissing the case pursuant to 11 U.S.C. § 1208 and in support thereof, respectfully states and alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, and Fed. R. Bankr. P. 5005. This is a core proceeding. Venue is appropriate before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The Petition commencing this case was filed on February 5, 2018, and the case is now pending in this Court.

3. This motion arises under 11 U.S.C § 1208 and Fed. R. Bank. P. 1017 and 9014. Hiawatha requests dismissal of the bankruptcy case for cause.

## BACKGROUND

4. Since at least 2014, Hiawatha extended loans to Mark Johnson (the "Debtor") and/or Springbrook Grain Farms, LLC ("Springbrook"), his wholly-owned sole-member LLC, and is the holder of one or more secured claims with an aggregate balance currently in excess of $2,670,000.

5. The Debtor is a farmer who primarily grows corn and soybeans, and also does odd jobs, such as trucking, for additional income.

6. On or about May 11, 2016, a grand jury in the Western District of Wisconsin returned an Indictment charging the Debtor with wire fraud and crop insurance fraud pursuant to Title 18, United States Code Sections 1343 and 1401. *See United States v. Mark Eugene Johnson*, W.D. Wis. Case No. 16-CR-00046 (Docket Entry No. 2).

7. The Indictment stated that from in or about December 2012 and continuing through in or about November 2014, the Debtor devised and intended to devise a scheme to defraud and to obtain money from the United States, through its crop loss insurance program, by means of false and fraudulent pretenses and representation by, among other things, falsely overstating his corn and soybean production to increase his insurance reimbursement, and submitting false crop yields loss claims for 2013 and 2014. *Id*.

8. On or about May 26, 2016, the Debtor entered a plea of not guilty in Case No. 16-CR-0046 in the United States District Court for the Western District of Wisconsin. *Id.* (Docket Entry No. 8).

9. On or about October 19, 2016, the Debtor was presented with a proposed plea agreement that required him to, among other things, agree to pay restitution in the amount of $228,523.35, which would be due and payable immediately and prior to sentencing. *Id.* (Docket Entry No. 43).

10. In November 2016, the loans with Hiawatha were in default and Hiawatha sent the Debtor a notice of default and demand to cure. The Debtor understood at that time that Hiawatha would likely commence legal action if those defaults were not cured, and during that time

continued his plea negotiations with the government. *See* Transcript of Hearing, Case No. 17-11448 (Docket Entry No. 145), at pp. 98-99.

11. On or about January 25, 2017, in anticipation of entry of the restitution order, the Debtor provided the District Court with $228,523.35 to be held pending further order from the District Court. *Id.* (Docket Entry No. 52).

12. Sentencing was held before the District Court on February 13, 2017. The Debtor pleaded guilty to one count and the District Court found the Debtor guilty pursuant to 18 U.S.C. § 1001(a)(3) of knowingly or willingly making false statements in a matter within the jurisdiction of the United States government. The District Court ordered the Debtor to pay mandatory restitution in the amount of $228,523.35 and a fine in the amount of $20,000 within 90 days. *Id.* (Docket Entry No. 64).

13. The Debtor sold crops in which Hiawatha and The Cooperative Finance Association, Inc. ("CFA") had a security interest, and used the proceeds to pay the restitution and fine. The Debtor did not tell Hiawatha or CFA that he was doing so. *See* Transcript of Hearing, Case No. 17-11448 (Docket Entry No. 145), at pp. 54-55.

14. Hiawatha sent the Debtor further notices of default and demands to cure dated February 28, 2017. *Id*. at 99.

15. On March 17, 2017, Hiawatha commenced its action in the Polk County Circuit Court, Case No. 2017CV83.

16. At some time in March 2017, the Debtor and Springbrook executed a Bill of Sale Assignment and Assumption Agreement pursuant to which the Debtor caused Springbrook to transfer to the Debtor any and all of its assets.

17. On or about March 21, 2017, the Debtor transferred all of the real property from Springbrook to Debtor by means of that certain Quit Claim Deed dated March 21, 2017, recorded March 24, 2017, as Document No. 849864.

18. The Polk County Circuit Court scheduled a hearing on Hiawatha's Application for the Appointment of a Receiver for April 26, 2017.

19. On April 25, 2017, the Debtor filed his voluntary petition under Chapter 12 of Title 11 of the United States Code. *In re Johnson*, Case No. 17-11448 (Bankr. W.D. Wis.).

20. In that case, the Debtor proposed a plan and two modifications. The Court ultimately denied confirmation of the Debtor's Second Amended Chapter 12 Plan (the "Denied Plan") for lack of feasibility by memorandum order dated January 12, 2018. *See In re Johnson*, ___ B.R. ___, No. 17-11448, 2018 WL 401183 (Bankr. W.D. Wis. Jan. 12, 2018). Based upon the finding that the record before the Court indicated "the Debtor will never be able to propose a confirmable plan," the Court dismissed that case on January 30, 2018. *Id*. at *6.

21. On January 31, 2018, Hiawatha obtained a Temporary Restraining Order from the Polk County Circuit Court in case no. 16 CV 83 prohibiting the Debtor from, among other things, transferring any of his property subject to a security interest of Hiawatha, and preserving the status quo until such time as the parties could come before the state court. That order scheduled a further hearing for Monday, February 5, 2018. Due to the Debtor's prior and unauthorized dissipation of the Bank's collateral, such relief was necessary and prudent.

22. That order was served on the Debtor on Thursday, February 1, 2018, and he indicated then to the Bank's officer and Sheriff's deputy that he would be seeking counsel and that there would be no further hearing before the state court.

23. On the morning of Monday, February 5, 2018, the parties had a telephone

conference with Judge Tolan regarding scheduling. During that conference, Judge Tolan scheduled the injunction hearing for 4:00 p.m. or as soon as the matter could be heard, and the Bank's travel distance to Polk County for that hearing was specifically discussed. Prior to that conference, the state court was informed by the Debtor that he was on his way to meet with his attorney (at 11 a.m.) and sign papers, presumably for another bankruptcy filing. At 3:37 p.m., this case was commenced as a partial filing.

24. The Debtor completed his filing with his Schedules and Statement of Financial Affairs on February 20, 2018. *See* Docket Entry No. 33. Despite having additional time since the date of filing, the Debtor's Schedules and Statement of Financial Affairs are substantially the same as those filed in his prior bankruptcy case, and even contain the same errors and omissions.

25. In response to Hiawatha's motion to dismiss, the Debtor stated that he "intends to propose a plan *substantially similar*" to the one attached as an exhibit to his objection (the "Sample Plan"). *See* Debtor's Objection to Hiawatha National Bank's Motion to Dismiss, Docket Entry No. 32 at ¶ 6.

26. As compared to the Denied Plan, the Debtor's Sample Plan does not present any greater chance of confirmation. And in any event, the Debtor testified that he is not prepared to propose any plan in the immediate future.

27. The Debtor has now been in bankruptcy since April 2017 without any measurable progress toward confirming a plan. He has used cash collateral without the consent of Hiawatha or CFA, the other creditor asserting an interest in certain cash collateral, and without court authority.

## ARGUMENT

The Debtor has known since at least January 12, 2018 that his (prior) case would be dismissed, and from Hiawatha's perspective, there is no justification for his current case other than

to hinder and delay Hiawatha from exercising its legal remedies due to the protracted defaults. This case presents nothing of material difference. Because the cases are substantially the same and present the same issues in terms of confirmation, this case is destined to fail and should be dismissed.

Section 1208(c) states that upon the request of a party in interest, the court may dismiss a case for "cause." The court "may find cause to dismiss where debtor 'lack[s] the ability to propose a confirmable Chapter 12 plan." *Johnson*, 2018 WL 401183, at *5. Dismissal for cause is appropriate where the court determines there is no reasonable prospect of the debtor confirming a plan. *Id. See also In re American Capital Equipment, LLC*, 688 F.3d 145, 161-62 (3d Cir. 2012); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 381 (8th Cir. 2000) (noting section 1112(b) permits dismissal of a chapter 11 case when there is a lack of any realistic possibility of confirming a plan). Indeed, this Court has already heard facts that the Debtor now asserts constitutes a change in circumstances and nevertheless, found that "the Debtor will never be able to propose a confirmable plan." *Johnson*, 2018 WL 401183, at *6.

Additionally, Section 1225 requires that a plan be proposed in good faith. Unless the Debtor shows changed circumstances, it can constitute a lack of good faith to refile a case under chapter 12 immediately following the failure of a prior case. *In re Szudera*, 269 B.R. 837, 844-45 (Bankr. D.N.D. 2001); *see also In re McKissie*, 103 B.R. 189, 192 (Bankr. N.D.Ill. 1989) (chapter 13). The court addressed a case similar to the one at bar in *In re Beswick*, 98 B.R. 900 (Bankr. N.D. Ill. 1989), where the debtors' first Chapter 12 case was filed just before a hearing was to be held on the secured creditors' foreclosure complaint in state court. The court noted that fact, "standing alone, would not constitute a lack of good faith; but the Debtors were then granted the opportunity, over more than a year, to present a Plan of Reorganization that met the confirmation requirements of

Chapter 12, and they failed to do so." *Id.* at 903. Then, after their first Chapter 12 case was dismissed, the secured creditor proceeded with actions in state court to recover its collateral, *id.*, just as Hiawatha did upon the dismissal of the Debtor's prior bankruptcy case. Also like the instant case, the debtors in *Beswick* then filed another Chapter 12 case, and "thereby imposing additional delays." *Id.* The court found dismissal to be warranted under the circumstances. *Id.* (citation omitted). In doing so, the court explained:

> The Debtors' actions also violate the purpose and spirit of Chapter 12. The legislative history suggests Congress intended Chapter 12 cases to move along expeditiously so as to protect creditors' interests and to preclude diminution in the value of collateral if a reorganization cannot be achieved. (citations omitted). Although courts have recognized that changed circumstances may justify the filing of a second Chapter 12 petition, something more than the mere allegation that circumstances have changed is required. (citation omitted). Changes in circumstances must have some objective significance. No such changes occurred between the date of dismissal, January 27, 1989, and the date of refiling, February 21, 1989. Thus, after failing to achieve confirmation in the first case, the Debtors now seek to commence another case and thereby impose the added delays which a single Chapter 12 case was intended to avoid.
>
> There is a more fundamental consideration, however, which compels the dismissal of the case on the basis of lack of good faith. By refiling a second case, rather than taking an appeal in the first case, the Debtors are circumventing the appeal process. The Debtors were given the opportunity to present a feasible Chapter 12 Plan in the first case, but could not do so. . . .
>
> If the Debtors disagreed with the Court's decision as to the feasibility of their Plan, or the dismissal of the case, they could have taken an appeal. Instead, the Debtors allowed the case to be dismissed, then refiled. The refiling is a circumvention of the normal appeal process available to losing litigants. It is, therefore, an abuse of bankruptcy procedures and remedies, and constitutes a lack of good faith.

*Id.* at 904. The court further noted that "refiling of a bankruptcy case, unlike the refiling of a criminal or civil case, is not barred by the doctrines of double jeopardy or res judicata" and accordingly, "courts must adopt a strict and critical stance toward any maneuvers or schemes which would have the effect of undermining the integrity of the system." *Id.* Since a Chapter 12 case had already been heard on its merits and decided, refiling of the "'same case' is so extraordinary an

action that the question is not whether Congress specifically prohibits it, but rather whether Congress specifically permits it. Congress does not." *Id*. That is precisely the case at bar.

In *In re Szudera*, the court likewise considered whether a Chapter 12 case filed just after dismissal of a prior case due to the plan being in default. 269 B.R. 837 (Bankr. D.N.D. 2001). In order to determine good faith "a court must examine the totality of the circumstances and give consideration to whether the debtor has unfairly manipulated the Code." *Id*. at 844. And, courts "traditionally look askance at repetitive filings in a short period of time and many courts believe them to be an abuse of the Bankruptcy Code." *Id.* at 845. The court in *Szudera* noted the "legislative history of Chapter 12 suggests that Congress intended Chapter 12 cases to move along expeditiously so as to protect a creditor's interest and to preclude diminution in the value of collateral if a reorganization cannot be achieved." *Id.* The court observed that the debtors in *Szudera* "were given a previous opportunity to present a feasible Chapter 12 plan in their first case" but were unable to perform according to that plan. *Id.* The court found that the plan presented in their subsequent filing, which was "filed on the very heels of a prior Chapter 12 case which was dismissed" afforded the debtors "no greater hope for a successful reorganization than did the plan in their previous, and now dismissed, Chapter 12 case." *Id*. Given the circumstances in that case, the court found "an abuse of the bankruptcy process for the Debtors to immediately re-file a Chapter 12 case and present yet another problematical plan and to do so constitutes a lack of good faith." *Id*.

In the Seventh Circuit, the existence of good faith likewise "depends upon the facts and circumstances presented" and if "it is obvious that a debtor is attempting unreasonably to deter and harass creditors in their bona fide efforts to realize upon their securities, good faith does not exist." *In re Loeb Apartments*, 89 F.2d 461, 463 (7th Cir. 1937). Here, the facts establish that the

Debtor has repeatedly used bankruptcy in an attempt to hinder and delay Hiawatha's exercise of its state law remedies. The Debtor had a full and fair opportunity to present a confirmable plan in his prior case and failed to do so. In fact, the change in circumstances alleged in this case were presented and considered in the prior case. In his prior case, the court noted that the Debtor obtained an extension of time in which to file a plan, and 233 days elapsed between the petition date and the confirmation hearing. *Johnson*, 2018 WL 401183, at *5. Yet "[n]o credible evidence was produced in that period that would permit a finding any plan can be confirmed within a reasonable time." *Id*. Likewise, the Debtor has not presented any evidence in this case that supports any new or additional information or a change in circumstances that would make a plan feasible in this case. And in any event, the Debtor testified that he is not prepared to propose any plan in the immediate future.

Because Hiawatha's collateral includes agricultural real estate, farm equipment, and farm products, now is the time of year to make arrangements for planting crops, and Hiawatha seeks to keep the agricultural real estate in production to avoid waste. In order to do so, it must act expeditiously regarding leasing the property and selling or otherwise disposing of farm equipment for use in the upcoming season. Farm products are particularly susceptible to loss in value, for example, due to changes in market value, and to outright loss, for example, due to improper storage. Further delay of even a few weeks could materially impair the value of Hiawatha's collateral.

The Debtor asserts a change of circumstances that justify his filing of the instant case. First, the Debtor claims he will propose a partial liquidation of property; second, the Debtor claims his yields exceeded what he testified to expecting at the prior confirmation hearing; third, the Debtor has joined a marketing plan and expects to receive a greater price going forward for crops that

would result in increased income; and fourth, the Debtor began driving commercial trucks when not farming for additional income. *See* Debtor's Objection, at ¶¶ 7-10. These arguments all fail for the reasons discussed below.

**A. Debtor's proposed partial liquidation of property does not support any change in circumstances, and would likely cause further cash flow and feasibility issues.**

In his Sample Plan, the Debtor suggests he will propose the following treatment:

> Within 30 days after the date the Court signs an order approving this Plan, Debtor will also contract with a realtor to sell real estate in an amount of net proceeds of not less than $875,000.00. Said sale will be accomplished in a commercially reasonable manner and not less than five years after the date the Court signs an order approving this Plan. Debtor will submit $325,000.00 to the supervision and control of the Trustee, and $550,000.00 to Hiawatha National Bank. Other creditors holding a security interest in said real estate will be paid the full amount of their claim.

*See* Exhibit to Debtor's Objection, at Art. I. However, the Debtor testified at trial that he was hoping not to sell of his real property, and that to do so would likely create cash flow issues in the future because he uses that real property to grow crops and earn income. The testimony of Roger Ray also indicated the Debtor had listed certain property for sale in the past, but those efforts were not fruitful. The Debtor also testified that he would look to sell equipment collateral before any real estate collateral. However, as noted in this and his prior bankruptcy case, the Debtor *leases* a substantial amount of his equipment collateral and at the end of the lease term, it is unclear whether he would become the owner and whether there would be any meaningful remaining value.

The Debtor's testimony at trial makes clear that while his Sample Plan proposes a sale of property, he has not actually identified any such property that could be sold without creating further cash flow issues, and suggests he need not do so now because he would have 5 years to accomplish that sale. Further, the Debtor's testimony makes clear that not only has he not given this any meaningful consideration, he actually hopes he will not even have to sell any of his property.

In any event, this provision is not confirmable over Hiawatha's objection insofar as it fails to

comply with 11 U.S.C. § 1206 by seeking to sell property free and clear of Hiawatha's interest but not providing all proceeds to Hiawatha, or, providing that those sale proceeds are subject to Hiawatha's secured interest. The Debtor has the substantially the same property as in his prior case. And, like his prior case, the Debtor's Sample Plan and supposed change in circumstances are "mere wishful thinking." *Johnson*, 2018 WL 401183, at *4.

**B. Debtor's testimony regarding his crop yields is inherently unreliable, lacks credibility and remain inconsistent with historic results.**

In his prior case, the Court described the Debtor's crop yield projections as "dubious." *Id.* In his prior case, the Court found it significant that the Debtor's projections did not provide any allowance for possible crop loss. *Id.* at *3. The Court continued to reason:

> As a result of the Debtor's conviction for crop insurance fraud, he is no longer eligible for crop insurance, and therefore any crop loss would directly reduce income. . . . There is no "reserve" for crop loss in the projections, and the past reported crop loss proceeds [on his tax returns] ranged from $39,210 to $274,933. . . Based on the nature of farming and the historic experience of this Debtor, the risk of crop damage or loss cannot be discounted. The fact that the Debtor's projections failed to account for the possibility of such loss casts even more doubt on his projections.

*Id.* This case is no different. The Debtor remains ineligible for crop insurance, and he testified in this case, as he did in his prior case, that there is "no room for error in farming." Transcript of Hearing, at p. 97. In his prior case, the Court further found that:

> Debtor testified that his corn yield ranged from 50 to 204 bushels per acre between 2010 and 2014. Despite that range, the Debtor projects over the next three years he will consistently have a 205 bushels per acre yield rate. Somehow and without explanation, the Debtor anticipates that he will have a yield over the next three years equal to or greater than any yield between 2010 and 2014. Again, the Debtor's projections and Plan reflect best hopes and wishful thinking rather than a realistic or credible assessment of his anticipated yields. It was apparent from the Debtor's testimony that the projections were the product of determining the amount needed to meet Plan payments and then adjusting projections to satisfy feasibility.

*Id.* at *4. The Debtor now testifies that he is projecting 185 bushels per acre yield rate. However, that projection does not demonstrate any change in circumstances, and in any event lacks credibility

for the same reasons stated by the Court in his prior case. Further, the Debtor's projections still "do not reflect the reality of his farm operation" *see id.*, and remain inconsistent with his historic results as well as the state and county average yields as reported by the United States Department of Agriculture, National Agricultural Statistics Service, for years 2015, 2016 and 2017.

Additionally, any testimony by the Debtor as to his crop yields is inherently unreliable as he testified he "guessed" his prior average yields, and did not have any accurate documentation to support his stated yields. There was an extended discussion at the confirmation hearing in his prior case of how the Debtor determined his prior average yields. *See* Transcript of Hearing, at pp. 66-67. There, the Debtor testified he had no documentation to substantiate his reported yields from prior years and plead guilty to making a false statements in connection with those crop yields. The Debtor also testified in his prior case that while he could have reviewed the prior yields that he reported to the USDA, those might not have been accurate because of "all the past legal problems" and specifically, the accusation that he was not reporting those correctly. *Id.* at pp. 93-94. The Debtor has not given any credible testimony before this Court that would make his current projections any less dubious and has not demonstrated any change from his prior case.

C. **Debtor's possible participation in a "marketing plan" and the fluctuation of market prices does not demonstrate a change in circumstances.**

The Debtor testified he could participate in a "marketing plan" with a company identified as Stewart-Peterson. According to the Debtor, this would maximize his income by having experts constantly watching market trends, managing price opportunities and advising as to the best time to sell crops to ensure the best prices. However, this does not constitute any change in circumstances because the Debtor testified he had participated in "marketing plans" before and discontinued the relationship because he was dissatisfied with the service. While that prior relationship was with a different company, the Debtor testified that Stewart-Peterson has been in

this business for some time and therefore, his sudden interest in possibly using their services is not demonstrative of any real change in circumstances. The Debtor also testified previously that he had people he would talk to that monitor the price fluctuation of agricultural commodities. *Id.*, at p. 122. So, the concept of using experts to help navigate the fluctuating commodities markets was not novel for the Debtor.

Additionally, the market fluctuations and futures were adequately addressed in the Debtor's prior case. There, the Debtor testified that he anticipated a gradual increase in crop prices over the next couple years based on future prices. *Id*. at pp. 87-88. However, the Debtor acknowledged in his prior case – as he has done in this one – that every year is different, and prices fluctuate. *See id*. at pp. 88-89. Logically, this could result in the Debtor falling short of his projected income (particularly due to his ineligibility for crop insurance) or exceeding it. *Id*. And in his prior case – as in this one – the Debtor explained that different futures contracts were also available to lock in prices. *Id*. at p. 122. So, the fact that the agricultural commodities market appears favorable and on the incline does not constitute any change in circumstances.[1] And in any event, in order to generate income, the Debtor must have sufficient yields, which projections remain questionable.

**D. Debtor's testimony as to his anticipated trucking income is no different from that given in his prior case and therefore demonstrates no change in circumstances.**

In his prior case, the Debtor testified that he had a "trucking division" from which he expected to generate ongoing income. *Id.* at pp. 26-27. There, the Debtor testified that his cousin was working for him, and that with that extra trucking income, he expected to make $10,000 to $15,000 per month going forward. *Id*. at p. 27. The Debtor also thought he would have roughly

---

[1] Additionally, futures prices change and update constantly, and are subject to a number of variables, such as the index on which they are traded (i.e., the "pit" or electronic), the month the crops are to be delivered, the quantity contracted for delivery, and the applicable basis.

$5,000 in expenses for every $15,000 in gross income, though he didn't have exact figures for the expenses. *Id.* The Debtor's Objection states that the Debtor expects to receive between $50,000 and $100,000 in additional net income from driving trucks. The Debtor testified at trial in this matter that he actually expected that amount to be $125,000. He testified as to certain expenses that he only recently itemized on paper with the assistance of his cousin, and as of a week before the hearing had still not done so. The likelihood of recurring trucking business is also not established. While that appears to be nothing other than more wishful thinking by the Debtor, even if it were true, he had already testified to that (almost exact) amount of net income in his prior case. Therefore, there is no change in circumstances due to his purported increase in income due to trucking, and to the extent the Debtor disagreed with the Court's prior finding on feasibility, his appropriate legal remedy was appeal. *Beswick*, 98 B.R. at 904.

**E. Debtor's Schedules and Statement of Financial Affairs are inaccurate and nearly identical to those filed in his prior case.**

A careful examination and comparison of the Schedules and Statement of Financial Affairs filed by the Debtor in this and his prior case reveals substantial similarities and fails to demonstrate any change in the Debtor's circumstances. Additionally, because this case was commenced as a partial filing with the Debtor taking the full fifteen days to complete his filing, it is reasonable to expect his Schedules and Statement of Financial Affairs to be updated, and not a mere copy of those that he filed in his prior case. For example:

- Debtor has generally failed to accurately updated and stated the debts he owes to creditors, including but not limited to Hiawatha and the numerous equipment lessors with whom he is substantially in default. (Elijah Wayne testified in detail in the prior case on behalf of Hiawatha as to the amounts that were currently due and outstanding. *See* Transcript of Hearing, at pp. 129-134.)

- Debtor listed exactly the same equipment values on his current Schedule B, Part 6 – Line 49 as in his prior case, and Line 49 in his current filing contains the same error as his prior case (i.e., the duplicative listing of the 2016 Case IH 8240 Combine with a

14

stated value of $325,000, which the Debtor testified is actually leased). Recognizing the depreciable nature of farm equipment, and particularly equipment that the Debtor testified has been in use, it is illogical that it would have *exactly* the same value as in April 2017.

- The Debtor failed to list American Express as an unsecured creditor in both cases. The Debtor testified that he did not list American Express in his prior case because there was nothing due and owing to it at the time of his prior filing, but that testimony lacks credibility in light of the Debtor's financial statements. The Debtor made regular monthly payments to American Express before filing his prior case in whole dollar amounts, and those payments continued in the same fashion post-petition without Hiawatha's consent or the Court's authority to do so.[2]

- Debtor testified that his income from last year is not accurately reflected on his current Statement of Financial Affairs, Part 2, Line 4.

- And, in both cases, the Debtor also failed to list on Schedule G the numerous parties from whom he leases farmland, and failed to note on his Statement of Financial Affairs, Part 11, Line 28, that he has provided financial statements to (at least) Hiawatha within the last 2 years.

### F. **Debtor's Sample Plan is nearly identical to that filed in his prior case and lacks any greater likelihood of confirmation.**

The Debtor's Sample Plan suggests he will pay Hiawatha on substantially the same terms as in his Denied Plan. The difference is that for two of the loans (that the Debtor still seeks to pay over a 30-year, fixed rate term), the Debtor appears to propose a 6% rate of interest – a mere 0.5% increase from his Denied Plan. In the prior case, the Court explained that "in the context of Chapter 12 cases, risk is often heightened due to the unpredictable nature of the agricultural economy." *Johnson*, 2018 WL 401183, at *4. Accordingly, the Court observed that bankruptcy courts generally adjust interest rates upward from the national prime rate by 1% to 3% depending on the risk. *Id.* The Court found the interest rate proposed for Hiawatha in the Denied Plan to be

---

[2] For example, the Debtor made pre-petition payments of $300 on January 11, 2017 (Hiawatha Ex. 9 at p. 41); $300 on February 8, 2017 (*Id.* at p.43); $300 on March 3, 2017 (*Id.* at p. 38); and $300 on April 3, 2017 (*Id.* at p. 36). Those payments continued in the same fashion post-petition: for example, payment of $312 on June 9, 2017 (*Id.* at p. 14); $311 on July 17, 2017 (*Id.* at p. 12); $346 on August 14, 2017 (*Id.* at p. 10); $311 on September 18, 2017 (*Id.* at p. 8); $350 on October 10, 2017 and $300 on October 19, 2017 (*Id.* at p. 6); and $100 each on January 10 and 19, 2018 (*Id.* at p. 3). Therefore, is unlikely that American Express was not owed anything in the Debtor's prior case, and unlikely that American Express was inadvertently omitted as a creditor in this case if the Debtor diligently prepared/reviewed his Schedules.

inadequate, reasoning:

> Currently, the national prime interest rate is 4.5%. The Debtor proposes the minimum risk adjustment provided by *Till*—1%. Yet, the Plan proposes extending the term of all of the loans and fixing the rate for those extended periods. The Debtor testified, without further explanation, that he believed the increase adequately compensates Hiawatha for its increased risk. When asked about how he arrived at the term and rate, he said he didn't know and the question should be posed to his lawyer.
>
> In response, Hiawatha's Commercial Loan Officer, Roger Ray ("Ray"), testified that Hiawatha, as a small bank, would never agree to a fixed interest rate for more than five years. The Plan would lock the bank into the 5.5% interest rate for significantly longer than it would consider under normal circumstances. Further, Ray testified it would present too much risk and terms that are in excess of market even outside of bankruptcy.
>
> The circumstances of the estate strongly favor a higher interest rate. As noted, the Debtor is no longer eligible for crop insurance and is exposed to the serious risk of crop loss. The Debtor's tax returns show he is consistently reporting losses or barely breaking even. The Debtor's precarious financial situation is further demonstrated by this petition, his bankruptcy in 1996, and now the bankruptcy of his sole membership LLC. Moreover, the Plan significantly extends the terms of some of the loans and at rates inconsistent with market rates even before a risk adjustment.
>
> Despite those many risk factors, Debtor proposes an increase of just 1%—the absolute minimum under *Till* and other cases that have addressed this issue. The amortization periods are also excessively long with fixed rates. No such terms are available in the market and this again underscores the absence of any reasonable basis other than that Debtor's counsel computed what Debtor could allegedly afford rather than presenting evidence that would support a conclusion Hiawatha would receive the equivalent of its claim under appropriate terms.

*Id.* at *5. This Court heard nearly identical testimony from the Debtor and Roger Ray on behalf of Hiawatha. Mr. Ray testified that there was no meaningful difference between the 5.5% previously proposed and the 6% suggested by the Sample Plan. Mr. Ray testified, as he did before, that the terms suggested by the Debtor remain substantially out of market and expose a small bank like Hiawatha to significant risk over a long period of time. The Debtor still had no explanation for how he could provide for Hiawatha to be adequately compensated for its increased risk (which remains materially the same as in his prior case, if not greater) and, as he did before, continued to defer to

counsel. Rather, his Sample Plan suggests an increase of 0.5% interest for Hiawatha, and only on the two loans that he is attempting to lock Hiawatha into for the longest term. There is nothing at all to suggest that such substantially similar treatment would now be adequate.

### G. Debtor's unauthorized use of cash collateral.

Pursuant to 11 U.S.C. § 363(c)(2), a Debtor authorized to operate under section 1204 may not use, sell or lease cash collateral *unless* (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section. 11 U.S.C. § 363.

The Debtor testified that throughout his prior case and even during his current case, he sold collateral of Hiawatha and/or CFA, and used the proceeds to pay his operating and personal expenses without consent or authority to do so. In his prior case, the Debtor filed a Motion to Use Cash Collateral on November 14, 2017 (Case No. 17-11448, Docket Entry No. 88). At least as of that date, there could be no confusion that the Debtor either needed Hiawatha's consent to use cash collateral (which he knew Hiawatha was unwilling to give) or the Court's authority. Nevertheless, the Debtor continued to use cash freely for his operating and personal expenses. *See* Hiawatha Exhibit No. 9, at pp. 3, 21-27. While the Debtor continued to sell encumbered collateral and use the proceeds to regularly pay American Express, T-Mobile and DirecTV, Hiawatha did not receive any payments while its collateral position further declined.

The Court may dismiss a case for "cause" pursuant to 11 U.S.C. § 1208(c). Here, the Debtor's continued unauthorized use of cash collateral constitutes further cause for dismissal under the circumstances. Such conduct by the Debtor constitutes an unreasonable delay or gross mismanagement that is prejudicial to creditors like Hiawatha and CFA, *see* 11 U.S.C. §

1208(c)(1) and also causes a continuing loss to or diminution of the estate where there is no reasonable likelihood of rehabilitation. *See* 11 U.S.C. § 1208(c)(9).

Based on all the facts and circumstance of this case and of the debtor's recently-dismissed prior case, this case a bar to refiling is warranted. Authority to impose a bar to refiling is found 11 U.S.C. § 349(a): "Unless the court, for cause, orders otherwise, the dismissal of a case under this title does not… prejudice the debtor with regard to filing a subsequent petition under this title…" Under 11 U.S.C. §§ 349(a) and 105(a), the Court has authority to order a bar to refiling. *In re Mendiola*, 573 B.R. 758, 765 (Bankr., E.D.Wis. 2017) At a minimum, the Debtor should be barred from refiling a case under title 11 for 180 days, following the guidance of 11 U.S.C. § 109(g). Moreover, Debtor should be barred from refiling for a longer period, in part due to Debtor's conduct and in part due to the nature of the underlying debts in this case.

In this case and in the recently-dismissed prior case, Debtor used cash collateral without authority to do so. Such conduct is "a serious breach of the fiduciary relationship owed by a debtor-in-possession to his creditors [and] to the court…" *In re Garcia*, 470 B.R. 488, 498 (Bankr. N.D. Ind. 2012) (imposing a 3-year bar to refiling). Debtor also made misleading and inaccurate statements in his schedules and statements and otherwise acted in a manner inconsistent with a good fair attempt to adjust debts under chapter 12.

Apart from Debtor's conduct, this case is largely a two-party dispute between Debtor and Hiawatha, and because there is no reasonable prospect for Debtor to reorganize without concessions by Hiawatha broader and deeper that it is willing to bear, Debtor is instead misusing bankruptcy to hinder and delay his primary creditor. Debtor's "situation prevents him from presenting a workable plan… and any subsequent case which the Debtor would file would be

solely to further delay [enforcement by the primary secured creditor]." *In re Dempsey*, 27 Fed. Appx. 21, 25 (7th Cir. 2007).

## **CONCLUSION**

Accordingly, Hiawatha respectfully requests dismissal of this case under 11 U.S.C. § 1208(c) and imposition of a bar on refiling another case under title 11 for 18 months pursuant to 11 U.S.C. § 349(a), so that Hiawatha can exercise its state court remedies without further delay, and for such other and further relief as is just and equitable under the circumstances.

**ECKBERG LAMMERS, P.C.**

Dated: March 16, 2018

By: s/ Amanda K. Schlitz
Amanda K. Schlitz (#1099341)
*Attorneys for Hiawatha National Bank*
430 Second Street
Hudson, WI 54016
(715) 386-3733
aschlitz@eckberglammers.com